UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DUSTIN INGRAM; FELISHA INGRAM; and L.I., Z.I., and D.I., minors, by and through their Guardian ad Litem, Seth Downham,<br><br>        Plaintiffs,<br><br>v.<br><br>KATIE MOUSER; JESSICA JOHNSON; and DOES 1 through 20 and 24 through 50 Inclusive,<br><br>        Defendant. | Case No. 1:19-cv-00308-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are Defendant Katie Mouser's Motion for Summary Judgment, Defendant Jessica Johnson's Motion for Summary Judgment (Dkt. 128), and Plaintiffs Dustin Ingram, Felisha Ingram, and minors L.I., Z.I, and D.I's (by and through their Guardian ad Litem, Seth Downham) Motion for Partial Summary Judgment. Also before the Court is Defendant Johnson's Motion to Strike and Plaintiffs' Motion to Reconsider. These matters are ripe for adjudication.

The Court heard oral argument on November 8, 2023. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. For the reasons outlined below, the Court will GRANT in PART and DENY in PART Plaintiffs' Partial Motion for Summary Judgment, GRANT Defendant Mouser's Motion

MEMORANDUM DECISION AND ORDER - 1

for Summary Judgment, DENY Defendant Johnson's Motion for Summary Judgment and Motion to Strike, and DENY Plaintiffs' Motion to Reconsider.

## II. BACKGROUND

### A.  Factual Background

The facts of this case are largely undisputed. On August 11, 2017, the Idaho Department of Health and Welfare (IDHW) received an anonymous report from a neighbor of Plaintiffs Dustin and Felisha Ingram (parents of minor Plaintiffs L.I., Z.I., and D.I.). The neighbor reported that Z.I. had an unexplained black eye and that she had heard "yelling, cussing and crashing" sounds from inside the trailer where the Ingrams resided. Dkt. 129, at 13. That night, an IDHW on-call social worker visited the Ingrams' trailer and spoke to Felisha[1] to follow up on the call. The social worker did not enter the home, but observed a burn injury on L.I.'s hand and questioned Felisha about that injury and the previously reported black eye. Felisha stated that L.I. burned herself retrieving a cup of hot water from the microwave, and that Z.I. received the black eye from his brother. After further questioning, Felisha ended the interview and stated IDHW could return to the trailer several days later when her husband would be home.

IDHW then reassigned the case to Defendant social worker Katie Mouser. On August 15, 2017, Dustin visited IDHW and questioned Mouser about the case. The following day on August 16, Mouser and Defendant Detective Jessica Johnson

---

[1] The Court does not intend to be informal by using the parties' first names; rather, because Plaintiffs share a last name, the Court uses first names (or, in the case of minor children, initials) when referring to individual Plaintiffs for the sake of clarity.

(collectively, "Defendants") visited the Ingrams' trailer with Sheriff's Deputy Neill, a nonparty to this case. The Ingrams allowed Defendants inside the trailer, which they observed to be "filthy." Dkt. 129-2, at 14–15. Water was puddled on the floor, trash and clutter were strewn throughout the trailer, feces and urine filled and were crusted onto the toilet, and open containers of food were lying about. The refrigerator was also dirty and had only a few items in it. Detective Johnson's report of the visit notes that Z.I. and D.I. were filthy and dirty, which Felisha stated was because they had been playing outside in the dirt that day. Felisha also stated that the home was in such a condition because she had been sick for several weeks prior to the visit.

After inspecting the home, Detective Johnson notified the Ingrams that she was declaring their children in imminent danger and taking them into state custody "based not so much on the referral but based on the condition of this home."[2]  Dkt. 153-4, at 127 (cleaned up). Detective Johnson told the Ingrams that a Shelter Care Hearing would occur the following day, explained the hearing process to them, and served them with a Notice of Hearing signed by Johnson.[3] During the visit, Detective Johnson also contacted the St. Luke's Faces of Hope Children at Risk Evaluation Services ("CARES") family advocacy center in downtown Boise and arranged for the children to receives medical examinations. Neither Detective Johnson nor Mouser had a court order or warrant to remove the children from the home. Additionally, neither Johnson nor Mouser informed the Ingrams that their

---

[2] Detective Johnson echoed this rationale in her written police report of the visit, stating "I was declaring their children in imminent danger due to the conditions of the home they were living in." Dkt. 129-13, at 6.
[3] The notice of hearing also indicated the children had been removed by a peace officer.

children would be medically evaluated at CARES or asked for their consent prior to the medical examinations. At detective Johnson's request, Mouser then transported the children to CARES where they were examined by Dr. Amy Barton.

The following day, on August 17, 2017, a Shelter Care hearing took place before Ada County Magistrate Judge Ellis. The Ingrams were represented by counsel and testified at the hearing. Detective Johnson also testified during the hearing, and the Ingrams' attorney was given the opportunity to cross-examine her. Although the Ingrams submitted photographic evidence that they had cleaned the trailer, the court determined to temporarily continue the children's custody with the State. Explaining its rationale, the court stated it wanted to ensure the trailer would not end up in the same condition it had been in when the children were removed because that was not a "healthy environment for three small children, plain and simple." Dkt. 129-10 at 21. The magistrate judge noted "as the finder of fact in this case, everybody I think is clear this is a dirty house case. I did not view it as a medical neglect case." *Id.* at 29. The judge also found:

> [T]he Department of Health and Welfare made reasonable effort[s] to eliminate the need for shelter care but those efforts were unsuccessful because law enforcement in this case intervened and made their decision and they are the ones with the authority in Idaho to make this decision. Just so you are clear, law enforcement is the one who chose to declare these children, it's not a Department of Health & Welfare decision to bring these children into care.

*Id.* at 21–22.

Following their removal and subsequent Shelter Hearing, the children were placed with foster families for a few weeks. During that time, Detective Johnson scheduled additional forensic interviews and medical examinations for all three children at CARES

MEMORANDUM DECISION AND ORDER - 4

as part of her ongoing investigation into the Ingrams' circumstances. Detective Johnson notified IDHW of the appointments, and the IDHW representative consented to the interviews and exams. No one informed Mr. and Mrs. Ingram of the appointments.

The Ada County magistrate court scheduled an adjudicatory hearing to take place on September 15, 2017. However, in lieu of the adjudicatory hearing, the parties entered a written stipulation on September 11, 2017 stating, in relevant part:

> It is acknowledged by the parent(s) that the children are neglected as they are without proper parental care and control, or subsistence, or other care and control necessary for their well-being because of the conduct or omission of their parents . . . and/or it is acknowledged by the parent(s) that she failed to provide a stable home environment . . . .

Dkt. 129, at 6.

The same day the parents signed the stipulation, the children were placed on an Extended Home Visit with the Ingrams. Full custody of the children was restored to the Ingrams on December 8, 2017.

### B. Procedural Background

The Ingrams initially brought this action against social worker Mouser, the Ada County Sheriff's Department ("ACSD"), detective Johnson, St. Luke's, Dr. Barton, the State of Idaho, and IDHW, as well as unknown Does 1 through 50, alleging violations of their civil rights under 42 U.S.C. § 1983 with underlying First, Fourth, and Fourteenth Amendment violations. Dkt. 1. On December 30, 2019, the Ingrams filed their First Amended Complaint. Dkt. 35. The First Amended Complaint Case dropped some defendants and added others. It also added a 42 U.S.C. § 1985 and *Monell* related claims against St. Luke's. *Id.* See generally *Monell v. Dep't of Soc. Servs. Of City of New York*,

436 U.S. 658 (1978). A first round of motions to dismiss followed, which the Court granted. Specifically, the Court granted the IDHW officials' Motion to Dismiss (Dkt. 48) in its entirety. Dkt. 62. The Court also granted St. Luke's and Dr. Barton's Motion to Dismiss (Dkt. 46) and dismissed the claims against St. Luke's for failing to plead sufficient facts to establish a *Monell* claim. *Id.*

The Court also dismissed the § 1983 claim against Dr. Barton with prejudice based on the good faith defense available to private individuals and entities in § 1983 lawsuits. *Id.* at 22–23. In addition, the Ingrams did not oppose dismissal of their § 1985 claim, leading the Court to dismiss it. *Id.* at 23. The Court nevertheless allowed the Ingrams leave to amend the First Amended Complaint. On July, 31, 2020, the Ingrams filed a Second Amended Complaint, asserting the same causes of action against St. Luke's and ACSD. Dkt. 64. Both St. Luke's and ACSD moved to dismiss, and the Court granted both motions. Dkt. 83. The Court also dismissed with prejudice the Ingrams' § 1985 claim. *Id.*

The instant motions were subsequently filed. Mouser filed her Motion for Summary Judgment on August 15, 2022. Dkt. 101. Detective Johnson filed her Motion for Summary Judgment on January 20, 2023. Dkt. 128. The Ingrams filed their Motion for Partial Summary Judgment on March 6, 2023. Dkt. 153. Johnson filed her Motion to Strike a section of the Ingrams' reply to her response to their Motion on April 24, 2023. Dkt. 173. All parties timely responded and replied to the pertinent motions according to the deadlines set forth by the Court.

# III. LEGAL STANDARD[4]

## A. Rule 56 – Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In a motion for summary judgment, the moving party bears the burden of production and persuasion. *Greene v. Camreta*, 588 F.3d 1011, 1021 (9th Cir. 2009) (vacated in part on other grounds by *Green v. Camreta*, 661 F.3d 1201 (9th Cir. 2011). Importantly, the Court does not make credibility determinations at this stage of the litigation. These determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

## B. Civil Rights under § 1983

42 U.S.C. §1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. To win on summary judgment under this provision, the plaintiff must show two elements: (1) that the defendant acted under color of state law and (2) that as a result, plaintiff suffered

---

[4] Defendant Mouser's Motion to Strike and Plaintiffs' Motion to Reconsider will be discussed following the Court's analysis of the various motions for summary judgment. The Court will set forth specific legal standards for those motions individually when it reaches their analysis.

a deprivation of a Constitutional or statutory right. *See, e.g., West v. Atkins*, 487 U.S. 42, 48 (1988). However, the doctrine of qualified immunity shields government officials performing discretionary functions from liability from damages so long as their conduct does not violate clearly established constitutional rights. "In deciding whether qualified immunity applies, [the court] asks two questions: (1) did the officer violate a constitutional right, and (2) was that right clearly established at the time of the events at issue?" *Seidner v. de Vries*, 39 F.4th 591, 595 (9th Cir. 2022) (cleaned up). Trial judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## IV. ANALYSIS

At issue here are the parties' cross-motions for summary judgment, Detective Johnson's motion to strike, and the Ingrams' motion to reconsider.[5] The Court will address each party's motion for summary judgment in turn, followed by the ancillary motions to strike and reconsider.

### A. Ingrams' Motion for Partial Summary Judgment

The Ingrams' Motion for Partial Summary Judgment asks the Court to rule in their favor on their § 1983 claims against Detective Johnson and Detective Mouser for an assortment of alleged Fourth and Fourteenth Amendment violations. The Court addresses

---

[5] The Ingrams did not file a separate Motion to Reconsider; rather, they included in their Motion for Summary Judgment a request that the Court reinstate claims it dismissed in a previous order. Because the Ingrams raise that issue under FRCP 60, the Court will consider their argument as a Motion to Reconsider.

the Ingrams' claims against each party separately below.

### 1. Claims Against Detective Johnson

The Court begins with the Ingrams' claims against Defendant Detective Johnson. The Ingrams bring § 1983 claims against Detective Johnson stemming from Johnson's decision to remove the children from their parents' custody and arrange for their medical examination.

First, the Ingrams argue that Johnson violated both the children's and the parents' Fourth and Fourteenth Amendment rights by removing the children from the parents' custody without a warrant on the basis of dirty home conditions. Second, they argue that Johnson violated their Fourth and Fourteenth Amendment rights by causing the children to be subjected to multiple medical examinations without a court order, parental consent, or exigent circumstances, and without providing notice to the parents, thereby depriving them of their right to be with the children during the exams.

To prevail on their § 1983 claims, the Ingrams must show two things: state action and the violation of a constitutional right. To overcome Detective Johnson's qualified immunity, they must also show the right was clearly established at the time of the alleged wrongful conduct. Here, the parties do not dispute that Johnson was acting under color of state law when she declared the children in imminent danger and removed them from the Ingrams' custody. Accordingly, the Court proceeds with its analysis of whether the Ingrams have shown a constitutional violation.

### a. Constitutional Violation - Warrantless Removal

"Parents and children have a well-elaborated constitutional right to live together

without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th 2000). Both the Fourth and Fourteenth Amendments protect this right. *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016). The Fourth Amendment protects "children's right to be secure in their persons against unreasonable seizures without a warrant" unless "the exigencies of the situation are so compelling that a warrantless seizure is objectively reasonable under the Fourth Amendment." *Id.* at 789 (cleaned up). The Fourteenth Amendment protects parents' right to live with their children by assuring "that parents and children will not be separated by the state without due process of law except in an emergency." *Id.* In the Ninth Circuit, "the tests under the Fourth and Fourteenth Amendment for when an official may remove a child from parental custody without a warrant are equivalent." *Id.*

Removing a child from a parent's custody violates the constitution unless the removal is either authorized by court order (i.e., a warrant) or is (1) supported by "reasonable cause to believe that the child is in imminent danger of serious bodily injury" and (2) the scope of the intrusion does not extend beyond that which is "reasonably necessary to avert that specific injury." *Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001) (citation omitted). In *Kirkpatrick*, the Ninth Circuit clarified the "imminent danger" standard, explaining that removing a child from the home without a warrant "is excusable only when officials have reasonable cause to believe that the child is likely to experience serious bodily harm *in the time that would be required to obtain a warrant*." 843 F.3d at 790 (emphasis in original), quoting *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007).

The Ingrams argue that Detective Johnson violated their Fourth and Fourteenth Amendment rights because she lacked reasonable cause to believe that the children would experience serious harm in the time it would have taken to obtain a warrant. More specifically, they contend that Johnson's decision to remove the children was based solely on the dirty conditions of their home, and that this basis was insufficient to justify warrantless removal.

In *Rogers*, the Ninth Circuit considered the state's warrantless removal of children based on filthy home conditions. 487 F.3d at 1288. In that case, Child Protective Services ("CPS") received a report of child neglect alleging that the children were regularly locked in their rooms and their parents' workplace, that one child's teeth were falling out due to bottle-rot, and that the home was dirty and maggot infested. *Id.* at 1291. CPS waited several days to investigate, then found no one home the first time they attempted to visit. *Id.* CPS waited another week before returning again. *Id.* At that time, CPS confirmed that the home was filthy: piles of dishes, dirty clothing, and trash were found throughout the home; the children's bedding and mattresses were dirty and without frames; what appeared to be feces were smeared on a bedroom wall; suspected rat droppings were on the floor; and what the officer believed to be vomit was in the bottom of a nightstand. *Id.* at 1291–94. Additionally, CPS observed that at least one of the children had bottle rot, that the youngest child had been locked in her room, that the children appeared malnourished, that there were five unsecured guns in the home, and that the children had multiple circular bruises on their bodies. *Id*. at 1292–93.

These facts notwithstanding, the Ninth Circuit upheld the District Court's finding

that "[the child]'s bottle rot, the children's malnourishment, and the disorderly conditions in the home *did not* present an imminent risk of serious bodily harm." *Id.* at 1295 (emphasis added). And certainly on their own, "the conditions of the home, even if as unsanitary as [CPS] asserts, fail[ed] to indicate any imminent risk of serious bodily harm." *Id.* Explaining its rationale, the Circuit Court reasoned "the presence of disorderliness and a small amount of droppings, feces, and other matter may increase the risk of eventual illness, but there is no indication in the record of any particular risk that the Rogers children would become seriously ill during the few hours that it would take [CPS] to obtain a warrant." *Id.* at 1295–96.

The Ninth Circuit highlighted several additional facts that underscored this lack of exigency. CPS classified the case as a ten-day response, and waited seven days after the first aborted visit before returning to the home. *Id.* at 1296. Additional*ly*, the CPS worker spent close to two hours talking with the family before removing the children from the home, and further delayed to wait for someone to bring a car seat rather than calling for an ambulance or emergency transport. *Id.* Each of these delays undermined a reasonable belief that the children would have been seriously harmed in the time required to obtain a warrant.

The Ninth Circuit has also explained circumstances that could be sufficiently exigent to justify to an officer's warrantless removal of children from their home. "Serious allegations of abuse *that have been investigated and corroborated* usually give rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody if they might again be beaten or molested during the time it would take to get a warrant." *Id.* at 1294–95 (emphasis added) (cleaned up). However, "an official's prior

willingness to leave the children in their home militates against a finding of exigency . . . ." *Id.* at 1295; *see also Mabe*, 237 F.3d at 1108 (finding that waiting four days after the initial interview to remove a child from the home "undermine[d] a reasonable belief of exigency."). Additionally, "the police cannot seize children suspected of being abused . . . unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been – or will be—committed." *Wallis*, 202 F.3d at 1138.

The Ingrams argue that, as in *Rogers*, their home's "filthy" conditions were insufficient grounds to support reasonable cause to believe that the Ingram children were likely to experience serious bodily harm in the time it would have taken Johnson to obtain a warrant. They point to several pieces of evidence to support this contention. First, Detective Johnson announced to the parents she was declaring the children in danger "based not so much on the referral, but based on the condition of this home . . . ." Dkt. 153-4, at 127. This statement was also reflected in her police report. Dkt. 129-13, at 6 ("I was declaring their children in imminent danger due to the conditions of the home they were living in.").  Johnson did not state to the parents any other basis for removal, and the information regarding potential abuse in the CARES interview reports was not discovered until *after* the removal. That information therefore cannot have formed the basis for her decision to remove the children. *See Wallis*, 202 F.3d at 1138 (finding that an officer's warrantless removal is appropriate only where "the information they possess *at the time of the seizure* is such as provides reasonable cause" (emphasis added)). The Ingrams also note that like in *Rogers*, several days passed between the anonymous report, IDHW's first visit to the home, and the actual removal, during which time the children were left at home in

the care and custody of their parents. Further, the Ingrams point out that Detective Johnson continued to allow the children to come in and out of the trailer during the approximately ninety-minute home visit and conversation with the Ingrams, despite her contention that the home was so imminently dangerous as to warrant immediate removal of the children. Like in *Rogers*, these facts "militate[] against a finding of exigency." 487 F.3d at 1295.

While the anonymous report from the neighbor did include suspicions of abuse because of Z.I.'s black eye, those allegations were not corroborated and did not form the basis of Johnson's decision to remove the children. Both Z.I. and Felisha indicated that the injury had been caused by Z.I.'s younger brother and not by either parent, and Detective Johnson did not identify potential abuse as the basis for removing the children in her police report.

Whether we accept the version of facts offered by the Ingrams or Detective Johnson, the Court finds there is no support in the record for the conclusion that Johnson had reasonable cause to believe the Ingram children were likely to experience serious bodily harm in the time it would have taken her to obtain a warrant. Therefore, the Court concludes that Detective Johnson violated the Ingrams' Fourth and Fourteenth Amendments by removing the children without a warrant.

### b. Qualified Immunity

Detective Johnson argues the Ingrams' § 1983 claims should be dismissed because they are barred by qualified immunity. As previously mentioned, "in deciding whether qualified immunity applies, [the court] asks two questions: (1) did the officer violate a constitutional right, and (2) was that right clearly established at the time of the events at

issue?" *Seidner*, 39 F.4th at 595 (cleaned up). For purposes of § 1983, a right is clearly

established when existing controlling precedent has "placed the statutory or constitutional

question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Whether a

constitutional right was clearly established at the time of the alleged conduct is a question

of law. *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009).

  The Court has already determined that Detective Johnson's warrantless removal of

the children from their parents' custody violated the Ingrams' Fourth and Fourteenth

Amendment rights. The Court has discussed at length the Ninth Circuit's decision in

*Rogers*, which is binding on this Court, and which established the rights of parents to be

free from governmental removal of their children without either a warrant or reasonable

cause to believe the children would be injured in the time required to obtain one. That

decision was handed down on May 29, 2007, clearly establishing the aforementioned

parental rights in this jurisdiction at that time. Johnson removed the children without a

warrant in August of 2017, more than a decade after the *Rogers* decision placed this

"constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Although Detective

Johnson contends she had no actual knowledge of the law, this argument is no defense;

"government officials are charged with knowledge of constitutional and statutory

developments, including all available decisional law." *Gutierrez v. Mun. Ct. of Se. Jud.

Dist., Los Angeles Cnty.*, 838 F.2d 1031 (9th Cir. 1988), *cert. granted, judgment vacated

sub nom. Mun. Ct. of Se. Jud. Dist., Cnty. of Los Angeles v. Gutierrez*, 490 U.S. 1016

(1989). And Johnson's arguments that the law was not clearly established simply because

the United States Supreme Court has not ruled on the issue is unavailing; Ninth Circuit

precedent has clearly established the law, and that law is binding on this Court. Accordingly, the Court finds that Detective Johnson violated a clearly established constitutional right and is not protected by qualified immunity from the Ingrams' § 1983 claims for removing the children from the home without a warrant.

c.   <u>Fourth and Fourteenth Amendment Claims – Medical Examinations</u>

"The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis* 202 F.3d at 1141. In *Wallis*, the Ninth Circuit explained that absent parental consent, physical examinations of a child "may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable . . . ." *Id.* The Ninth Circuit further held that "barring a reasonable concern that material physical evidence might dissipate or that some urgent medical problem exists requiring immediate medical attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations." *Id.* (cleaned up).

In addition to the right to receive notice before children are subjected to investigatory physical examinations, "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention" or to be nearby if there is a legitimate reason for excluding them ruing examination. *Id.* at 1142. Similarly, "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations . . .

." *Id.*

Here, two sets of medical examinations took place: initial exams at CARES on the day the children were taken into State custody, and forensic examinations that took place several days after the Shelter Care hearing as part of Detective Johnson's investigation. The Ingrams did not receive adequate notice of or consent to either set of examinations and, as a result, had no opportunity to be with or offer comfort to their children during the examinations.[6]

Detective Johnson argues that she cannot be liable for the medical examinations because she did not perform them and was only involved with them in a very minimal capacity. These arguments are unavailing. Indeed, the very case establishing these rights was a case in which law enforcement officers took the children into state custody and arranged for their medical examinations but did not themselves perform the exams. *See Id.* Furthermore, Detective Johnson's arguments that "she did not cause the children to be subjected to medical examinations" and "had no control over whether [the children] would actually be taken to CARES" are disingenuous. Dkt. 129, at 23, 25. Johnson ordered the exams. By her own testimony, she had previously ordered, attended and read the reports of dozens of CARES exams; she was familiar with their scope. Dkt. 153-4, at 182–83. But-for Johnson's decision to take the children into custody (a decision which by statute was

---

[6] Johnson seems to argue that she did provide adequate notice of the initial exams because she briefly mentioned the children would be examined when she declared them in imminent danger. This "notice" was inadequate; Johnson did not tell the Ingrams when the examinations would take place or where the children would be evaluated, giving the parents no practical way to exercise their rights to be with the children at the examinations. Furthermore, Johnson implied to the Ingrams that no medical examinations would occur until after the Shelter Hearing the next day, which was not the case. Dkt. 153-4, at 83–86.

hers alone to make), her phone call to CARES to schedule the appointments, and her direction to Mouser that the children be taken to the appointments Johnson had scheduled at CARES, the children would not have been medically examined at CARES. "Government officials, like other defendants, are generally responsible for the natural or reasonably foreseeable consequences of their actions." *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009) (cleaned up). Johnson cannot evade liability by misrepresenting the obvious and inevitable consequences of her decision to order the examinations and direct IDHW to transport the children to clinic.

Johnson also argues that "parents who have been lawfully deprived of the custody of their children do not retain federally protected rights to receive information or control the medical treatment provided." Dkt. 161, at 19. But this argument is unpersuasive for two reasons. First, the Court has already found that the parents were *unlawfully* deprived of the custody of their children. Second, even if the children had been lawfully removed, the parents would still retain their rights to receive notice of and the opportunity to comfort and be with or near their children when the medical examinations were taking place. *See Wallis*, 202 F.3d at 1142. The unpublished memorandum disposition Johnson cites to support her contention, *Safouane v. Fleck*, 226 F. App'x 753 (9th Cir. 2007), is unhelpful. In that case, the plaintiffs' parental rights had already been adjudicated and terminated by a court of law before they attempted to bring their claims. *See id.* No such proceedings have taken place here, nor were the Ingrams' parental rights otherwise terminated at any point. Parental rights in the "care, custody, and management of their child do[] not evaporate because they have not been model parents or have lost temporary custody of

their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The Ingrams had a right to know of and be with their children during the medical examinations Johnson ordered.

Johnson argues in the alternative that if she is liable for the medical examinations, her liability is limited only to the initial examinations conducted at CARES because judicial authorization cuts off her liability for the forensic examinations that were scheduled and carried out after the Shelter Hearing. In a § 1983 action, "the plaintiff must demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (cleaned up). To prevail, a plaintiff must show both causation in fact and proximate cause. *Id*. "Judicial action may sufficiently disrupt the causal connection between a negligent act and subsequent harm to become a superseding, intervening cause." *Cox v. Dep't of Soc. & Health Servs.*, 913 F.3d 831 (9th Cir. 2019).

During the Shelter Hearing, the magistrate judge stated that part of the legislature's purpose in enacting the Idaho child protection statute was to enable IDHW to conduct investigations when reasonable cause supports removing children from the home. Dkt. 129-10, at 20. The judge also stated that neither law enforcement nor IDHW had yet had the opportunity to conduct such investigations in this case. *Id.* Johnson argues that the Judge's actions during the Hearing amounted to judicial authorization for her criminal investigation, giving her carte blanche to order investigatory medical exams without providing notice to the Ingrams. But while the court did allow the State to retain custody so more information could be gathered, it did not speak to the permissible scope or

constitutional limitations of any investigations, nor did it affirmatively authorize any specific actions that could be pursued as part of IDHW or Detective Johnson's investigations. The Court did not order any medical examinations. It did not direct Johnson to do so. It did not recommend that further examinations were needed. Johnson alone made the determination to order the forensic medical examinations. Thus, there is no basis to find that the Judge's actions in the Shelter Hearing (the purpose of which was to primarily to determine the court's jurisdiction) constitute an intervening cause that break the chain of Johnson's liability. Because of this, the Ingrams' damages are not limited to those incurred in the timeframe between the children's removal and the Shelter Hearing; rather, they may also claim damages for the constitutional violations arising from the post-hearing forensic medical exams.

### d.  Qualified Immunity – Medical Examinations

Having determined that Detective Johnson also violated the Ingrams' constitutional rights by subjecting the children to medical exams without parental notice, consent, or opportunity to be present, the Court next turns to whether those rights were clearly established at the time of the violation.

The Ingrams acknowledge that one case upon which they rest their medical examination arguments, *Mann v. County of San Diego*, 907 F.3d 1154 (9th Cir. 2018) was not decided until 2018, after the children were subjected to medical examinations in 2017. However, all the case law the Court cited above outlining the Ingrams' Fourth and Fourteenth Amendment rights to parental notice, consent, and the opportunity to be with their children during medical examinations predate Detective Johnson's warrantless

MEMORANDUM DECISION AND ORDER - 20

removal of the Ingram children. *See, e.g. Wallis*, 202 F.3d at 1141–42 (finding that (1) absent parental consent, medical examinations of a child "may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable;" (2) "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention;" and (3) "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations . . . ."). *Wallis* was decided in 2000, more than fifteen years before the events in this case took place. Therefore, the Court finds that these rights were clearly established at the time of the constitutional violations here, and Johnson is not entitled to qualified immunity.

### 2. *Claims Against Social Worker Mouser*

The Court next turns to the Ingrams' claims against IDHW social worker Defendant Mouser. The Ingrams' allegations against Mouser are similar to their claims against Johnson. The Ingrams contend that Mouser violated the minors' Fourth and parents' Fourteenth Amendment rights through her "integral participation" in the children's removal without court order or exigent circumstances. Dkt. 153-1, at 27. They also assert Mouser violated the parents' Fourteenth and minors' Fourth Amendment rights through her role in causing the children to be subjected to medical examinations without parental notice or consent, court order, or exigent circumstances. *Id.*

The Court has already articulated the legal standards applicable to the alleged Fourth

and Fourteenth Amendment violations at issue here, as well as qualified immunity generally. Additionally, the Court has already found that removing the children from the home without a warrant and subjecting them to medical examinations without parental notice or consent constitute Fourth and Fourteenth amendment violations. The task before the Court now is determining whether Mouser's actions were sufficient to make her an "integral participant" in the constitutional violations and therefore subject her to § 1983 liability.

a. Integral Participant

A state officer "need not have been the sole party responsible for a constitutional violation before liability may attach" under § 1983. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019). A person deprives another of a constitutional right under § 1983 "if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (citation omitted). In a § 1983 action, "the requisite causal connection may be established when an official sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional harms." *Id.* (cleaned up). "Thus, under [Ninth Circuit] case law, an officer could be held liable where [he or she] is just one participant in a sequence of events that gives rise to a constitutional violation," so long as his or her participation is fundamental, integral, or personal. *Nicholson*, 935 F.3d at 692.

However, liability may not "be imposed based on a 'team effort' theory" that would

lump all defendants together instead of "bas[ing] each individual's liability on his own conduct." *Peck v. Montoya*, 51 F.4th 877, 890 (9th Cir. 2022). Rather, "[l]iability requires at least enough individual involvement from each defendant to put him on notice that his conduct might reasonably lead to a constitutional violation." *Id.* at 891.

The Ingrams argue that Mouser was an integral participant in both constitutional violations: removing the children from the home without a warrant, and subjecting the children to medical examinations without parental notice, consent, or opportunity to be present. Dkt. 153-1, at 27–29. Mouser counters that her involvement in these decisions was extremely limited and therefore she should not be subject to § 1983 liability. Dkt. 164-1, at 10–11. The Court will separately address Mouser's involvement in each constitutional violation.

i. *Warrantless Removal*

In the state of Idaho, social workers do not have the authority to declare children in imminent danger and take them into state custody without judicial authorization. Idaho Code section 1608(a) provides that only law enforcement—a "peace officer"—may take a child into shelter care without a warrant.

The Ninth Circuit has previously held that officials who remove children without a warrant at the direction of other officials without participating in the removal decision are entitled to qualified immunity. In *Sjurset v, Button*, 810 F.3d 609, 612–13 (9th Cir. 2015), law enforcement removed children at the direction of officials from the Oregon Department of Human Services ("ODHS"), who had statutory authority to conduct warrantless removals of children in exigent circumstances. There, even though the officers entered the

home and removed the children, the court found the officers "made no independent decisions regarding protective custody and merely assisted [ODHS] in securing the children." *Id.* at 620. Accordingly, the Court found the officers' qualified immunity protected them from § 1983 liability for the removal.

The Ninth Circuit highlighted the catch-22 officials would find themselves in if they could be held liable for simply carrying out the decisions of other officials:

> "either challenge [the] determination, which could potentially endanger the children's safety and put the officers at risk of liability or discipline if harm had befallen the children, or carry out [the official's] instructions in the absence of a court order at the risk of being sued for violating the children's and the parents' constitutional rights. The correct answer would not be obvious to a reasonable officer."

*Id.*

The Ingrams, who have the burden of production and persuasion on their motion, make the bare assertion that Johnson and Mouser together reached the decision to remove the children based on the home conditions. As evidence to support this assertion, they cite only an excerpt of their own Statement of Undisputed Facts stating Mouser and Johnson both inspected the trailer, and an excerpt of Mouser's deposition transcript wherein she states she entered the trailer "probably three times." Dkt. 153-5, at 108. These excerpts fail to show that Johnson and Mouser even had a conversation during the inspection, let alone a conversation in which Mouser was an integral participant in deciding to remove the children.

On the contrary, the record shows that the circumstances here are nearly identical to the circumstances in *Sjurset*. Johnson, the only person with authority to remove the

children without a warrant, made the decision to remove on her own, and Mouser acted only at her direction. In Mouser's deposition, she states that she was told the decision was being made, and she merely "acted as [she] was supposed to in [her] role." Dkt 153-5, at 140. Detective Johnson acknowledged in her deposition that it was her normal practice to tell the social worker when she was declaring a child in imminent danger, and that consulting with the social worker regarding the decision was not normal practice. Dkt. 153-4, at 121–22. At the Shelter Hearing, the magistrate judge also confirmed it was law enforcement's decision to remove the children.[7]

Detective Johnson was the only person in the situation with the statutory authority to remove the children without a warrant, a fact which both she and Mouser knew. Dkt. 129-10, at 21–22. The record shows she made that decision independently. Mouser did not make that decision or participate in the decision-making process. That Mouser was part of the same response team as Johnson is an inadequate basis to find her liable for Johnson's actions. *See Peck*, 51 F.4th at 890. Simply performing the fundamental aspects of her job by walking through the home and interviewing the children does not constitute enough individual involvement to "put [Mouser] on notice that [her] conduct might reasonably lead to a constitutional violation" Johnson, not Mouser, is the party responsible for that violation. *Id.* at 891.

Accordingly, the Court finds Mouser did not play an integral role in the warrantless removal of the children from the home, and therefore is not subject to § 1983 liability for

---

[7] "Just so you are clear, law enforcement is the one who chose to declare these children, it's not a Department of Health & Welfare decision to bring these children into care." Dkt. 102-7, at 23.

Johnson's decision to do so.

## ii. *Medical Examinations*

The Ingrams also allege Mouser violated their Fourth and Fourteenth Amendment rights by driving the children to the initial medical examinations without providing parental notice, obtaining their consent, or affording them the opportunity to be present during the exams. This argument fails for the same reasons just discussed: Mouser was acting only at the direction of Detective Johnson. For the same reasons as stated above, the Court finds that *Sjurset* applies, and Mouser's qualified immunity protects her from the Ingrams' § 1983 claims. As a result, the Court denies the Ingrams' Partial Motion for Summary Judgment with respect to their claims against Mouser.

## B. Detective Johnson's Motion for Summary Judgment

Detective Johnson raises four arguments in her motion for summary judgment. First, she contends the Ingrams' claims are barred by collateral estoppel because the issue of whether the children's removal was proper was already adjudicated in the underlying child protection case. Next, she argues that judicial estoppel precludes the Ingrams from arguing that removal was improper because they took a contradictory position in the Shelter Hearing and stipulation in place of an adjudicatory hearing. Third, she asserts that the Ingrams' claims are barred by *Heck v. Humphrey* because prevailing in this case would imply the invalidity of their separate criminal sentences. Fourth, she argues she is entitled to qualified immunity.

### 1. *Collateral Estoppel*

"Collateral estoppel, or issue preclusion, bars the relitigation of issues actually

adjudicated in previous litigation between the same parties." *Beauchamp v. Anaheim Union High Sch. Dist.*, 816 F.3d 1216, 1225 (9th Cir. 2016) (citation omitted). "For the doctrine to apply: (1) the issue must be identical to one alleged in prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been critical and necessary to the judgment." *Id.* (cleaned up).

Here, Johnson argues that the Juvenile Court actually adjudicated the issue of whether removing the children without a warrant was proper in the Child Protection hearing. She states, "the court decided that there was reasonable cause to remove the children from the home because they were in immediate danger." Dkt. 129 at 4–5. In support of this contention, Johnson cites several pages of the hearing transcript wherein the court articulated its findings, including that the children come within the jurisdiction of the Child Protective Act; that IDHW made reasonable efforts to eliminate the need for shelter care but was unable to do so because of law enforcement intervention; that law enforcement declared the children and brought them into state care, rather than IDHW; and that "it would be contrary to the welfare of the children" to return them to the home at that point in time. Dkt. 129-10 at 21–22..

The Ingrams counter that the issue actually being adjudicated at the Shelter Care hearing was whether there was reasonable cause to believe the Court had jurisdiction under the Idaho Child Protective Act based on the petition filed on August 17, 2017. The Ingrams cite to various excerpts of the hearing transcript as evidence. See, e.g., Dkt 129-10, at 1 ("We are now going to conduct a hearing to determine whether there is reasonable cause to believe this Court has jurisdiction under the Idaho Child Protective Act based on the

petition that was filed on today's date . . . ."), 18 ("The State has met its burden of showing there's reasonable cause these children come within the jurisdiction of this Court."). Under Idaho Code section 16-1603, the court has exclusive original jurisdiction under the Idaho Child Protective Act "concerning any child living or found within the state (a) who is neglected, abused, or abandoned by his parents, guardian, or other legal custodian, or who is homeless; or (b) whose parents or other legal custodian fails to provide a stable home environment," (cleaned up). Finding that a child is neglected, abused, or abandoned, or that the custodian failed to provide a stable home environment is not necessarily the same as finding that a "child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers*, 487 F.3d at 1294.  And in fact, neither the court nor any of the parties even mentioned a warrant (or the absence thereof) during the Shelter Hearing.

Whether there was reasonable cause to believe the Juvenile Court had jurisdiction over the children is a distinct issue from that of whether removal of the children without a warrant was proper. Because the former issue was actually adjudicated in the shelter hearing, while the latter was not even raised, collateral estoppel does not bar the Ingrams from bringing their claims against Detective Johnson for warrantless removal of the children.[8]

---

[8] Johnson also argues that collateral estoppel bars Plaintiffs' claims because in lieu of an adjudicatory hearing, the Ingram parents entered into a stipulation acknowledging that the children were either neglected and/or that the parents failed to provide a stable home environment. Dkt. 129, at 5–6. Finding neglect and/or a failure to provide a stable home environment is not the same as finding that the children would suffer serious harm in the time required to obtain a warrant. The parents' claims are not collaterally estopped because of their stipulation.

### 2. *Judicial Estoppel*

Judicial estoppel is an equitable doctrine invoked by a court at its discretion "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (cleaned up). Although the doctrine "cannot be reduced to a precise formula or test," there are three factors that "typically inform the decision whether to apply the doctrine in a particular case:" (1) "a party's later position must be clearly inconsistent with its earlier position," (2) "the party has succeeded in persuading a court to accept that party's earlier position," and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Zedner v. United States*, 547 U.S. 489, 504 (2006) (citation omitted). The application of judicial estoppel not only bars a party from asserting inconsistent positions in the same litigation; it also is "appropriate to bar litigants from making incompatible statements in two different cases." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).

The Court concludes that judicial estoppel does not bar the Ingrams' claims here. The first factor—that a party's position be clearly inconsistent with a prior position—is not met. Here, as well as in the proceedings before the administrative judge, the Ingrams agreed that their home was cluttered and dirty when the children were removed. They also stipulated "that the children are neglected . . . and/or it is acknowledged by the parent(s) that [they] failed to provide a stable home environment. . . . and/ or that the parents failed to provide a stable home environment." Dkt. 129, at 6. But that is not necessarily

inconsistent with the position that they now argue, that finding a home to be dirty, cluttered, and unstable is an inadequate basis for warrantless removal of the children.

Because the Court finds that the position Ingrams argue is not inconsistent with any prior position they have taken, the Court concludes its inquiry and finds that judicial estoppel does not bar their claims.

### 3. *Heck* Preclusion

*Heck v. Humphrey*, 512 U.S. 477 (1994), "bars a § 1983 action that would imply the invalidity of a prior conviction if the plaintiff could have sought invalidation of the underlying conviction via direct appeal or state post-conviction relief, but did not do so." *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019). The Ninth Circuit has interpreted *Heck* as stating "if a criminal conviction arising out of the same facts stands and is fundamentally inconsistent with the unlawful behavior for which section 1983 damages are sought, the 1983 action must be dismissed." *Smithart v. Towery*, 79 F.3d 951, 952 (1996). Whether the Ingrams' § 1983 claims are barred by the *Heck* preclusion doctrine is a question of law. *Snyder v. Robinson*, 2022 WL 2982779 at *9 (D. Idaho July 28, 2022).

In connection with Detective Johnson's visit to the Ingram home, she charged Mr. and Mrs. Ingram with a misdemeanor for "Children-Injury to Child." Dkt. 129-2, at 1. As probable cause for the charge she stated "Dustin and Felisha Ingram willfully permitted their children, [Z.I., L.I., and D.I.], to live in a home environment in which their health might have been endangered . . . ." *Id.* The Ingrams later pled guilty to willfully and maliciously disturbing the peace of their children by tumultuous conduct between February 1, 2017, and August 15, 2017. Their sentences included one year of unsupervised probation

and required that there be no new IDHW cases against them.

Idaho Code section 18-1501(5) defines "willfully" as "acting or failing to act where a reasonable person would know the act or failure to act is likely to result in injury or harm or is likely to endanger the person, health, safety or well-being of the child." The statute defines "maliciously" as "import[ing] a wish to vex, annoy, or injure another person, or an intent to do a wrongful act." Idaho Code section 18-101(4).

Mr. and Mrs. Ingram undoubtedly pled guilty to conduct that was likely to cause injury or endanger the health and safety of their children. But timing matters here. As the Court has discussed at length, the standard for warrantless removal of children from the home is reasonable cause to believe that the children are "likely to experience serious bodily harm *in the time that would be required to obtain a warrant*." *Rogers*, 487 F.3d at 1294 (emphasis added).  And as the Ingrams argue, they "did not plead guilty to any charge that their 'tumultuous conduct' put their children in imminent danger of serious bodily harm or physical injury in the time it would take to obtain a warrant . . . ." Dkt. 146, at 19. Furthermore, the Ingrams pled guilty to disturbing their children's peace between February 1 and August 15, 2017, a time frame which does not include the date on which Johnson removed the children and the alleged constitutional violations occurred.

That the Ingrams willfully and maliciously disturbed the peace of their children by their tumultuous conduct, and that such conduct was not reasonably likely to cause harm within the time required to obtain a warrant can both be true. Thus, allowing the Ingrams' § 1983 claims to go forward does not imply the invalidity of their criminal conviction. Their claims are, therefore, not barred by *Heck* preclusion.

### 4. *Qualified Immunity*

The Court has already discussed Detective Johnson's arguments for qualified immunity above in its analysis of the Ingrams' Partial Motion for Summary Judgment. The Court has found that Johnson is not entitled to qualified immunity and need not conduct a duplicative analysis here.

Having found that neither qualified immunity nor any preclusion doctrine bar the Ingrams' recovery against Johnson, the Court denies her Motion for Summary Judgment and proceeds to its analysis of Mouser's Motion for Summary Judgment.

## C. Mouser's Motion for Summary Judgment

Mouser raises two arguments in support of her Motion for Summary Judgment. First, she argues that she is entitled to qualified immunity because she did not make the decision to remove the Ingram children or have them medically examined and therefore did not violate any constitutional rights. Alternatively, she argues that if the Court does not find she is protected by qualified immunity, the Court should find that damages against her are limited to those incurred prior to the Shelter Care Hearing on August 17, 2017 because the magistrate judge's decision to keep the children in state custody was an intervening cause that cut off her liability.

The Court has already discussed both of these arguments at length above. Having found that Mouser is entitled to qualified immunity, the Court grants Mouser's Motion for Summary Judgment.

## D. Johnson's Motion to Strike

The Court next turns to Detective Johnson's Motion to Strike. Dkt. 173. Johnson

argues that the Ingrams included an impermissible argument in their reply brief to Johnson's response to their Partial Motion for Summary Judgment. More specifically, Johnson argues the Ingrams were not allowed to raise defenses to collateral estoppel in that reply brief because they did not raise the issue in their initial motion, and Johnson did not raise the issue in her response. Rather, she contends that these arguments are a second response by the Ingrams to her previous Motion for Summary Judgment, which they had already replied to once. A surreply—a second response by a party opposing a motion—is not authorized by the Federal Rules of Civil Procedure nor the Local Rules.

While true that new arguments and evidence cannot be raised in a reply, the issue is a moot point here. The Ingrams have already made nearly identical collateral estoppel arguments in their initial response to Johnson's motion, and permissibly raised those arguments at oral argument. Because the Court has already properly considered elsewhere in the record the arguments Johnson asks the Court to strike from the Ingrams' reply, the parties will not be prejudiced if the motion is denied. Therefore, the Court dismisses Johnson's Motion to Strike as moot.

### E.  Plaintiffs' Motion to Reconsider

Finally, the Court turns to the Ingrams' Rule 60 motion. At the end of their Motion for Summary Judgment, the Ingrams argue that the Court should exercise its power under Federal Rule of Civil Procedure 60(d)(1) to reinstate their *Monell* claims against the County of Ada. Rule 60(d)(1) preserves the Court's right to "entertain an independent action to relieve a party from a judgment, order, or proceeding . . . ." Fed. R. Civ. Pro. 60(d)(1). An independent action is a new action filed when "the right to make a motion is lost by the

expiration of the time limits fixed in these rules . . . ." *United States v. Beggerly*, 524 U.S. 38, 45 (1998). A Rule 60(d)(1) movant is required to meet a "demanding standard" showing that allowing the judgment to stand would be a "grave miscarriage of justice." *Id.* at 47. Consequently, Rule 60(d)(1) grants are "reserved for those cases of injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the doctrine of res judicata." *Id.* at 46 (cleaned up).

The Ingrams' invocation of Rule 60(d)(1) here is inapposite. The Ingrams have not instituted a new action such that Rule 60(d)(1) applies; rather, they seek relief from a prior order issued in *this* action. *See Walnut Creek Manor, LLC v. Mayhew Ctr.*, 2013 WL 6491341, *3 n.2 (N.D. Cal. Dec. 10, 2013) (finding a Rule 60(d) motion procedurally defective where a party sought relief from a prior order in the same action rather than filing an independent action setting aside judgment); *see also* Rule 60, Advisory Committee Note of 1946 (indicating that Rule 60(d) merely preserves the existence of a "procedural remedy. . . by a *new or independent action* to set aside a judgment." (emphasis added)). This is especially problematic here because Ada County—the party against whom the Ingrams seek to reinstate their *Monell* claim—has been dismissed from the case and has not had an opportunity to respond to the Rule 60(d) Motion. Because the Ingrams' Motion is procedurally defective, the Court DENIES the Ingrams' Rule 60(d) Motion to Reconsider.

Even if the Ingrams had filed an independent action to challenge the February 1, 2022 order, they likely would not meet the "demanding standard" that is required for relief under Rule 60(d)(1). *Beggerly*, 524 U.S. at 46. The Ingrams have still not made the requisite showing that Ada County has an unconstitutional policy to remove children without court

order in the absence of exigent circumstances. On the contrary, the Ingrams have shown that Ada County does have a policy outlining that children may only be removed without a warrant when they are in imminent danger of serious harm. This policy is not incompatible with the Ninth Circuit's holding that warrantless removal is only proper when children are likely to be harmed in the time that would be required to obtain a warrant.

## V. CONCLUSION

There is no genuine dispute of the material facts surrounding the warrantless removal of the Ingram children from their parents' custody. Detective Johnson violated the Ingrams' clearly established Fourth and Fourteenth Amendment rights in doing so. Accordingly, the Court finds that the Ingrams are entitled to an award of summary judgment in their favor with respect to liability on their Fourth and Fourteenth Amendment § 1983 claims against Johnson. Similarly, the Court finds the Ingrams are entitled to summary judgment in their favor on liability for their Fourth and Fourteenth Amendment claims against Johnson for causing the children to be subjected to medical examinations without parental consent, notice, or opportunity to be present. The Court therefore grants the Ingrams' Partial Motion for Summary Judgment with respect to their claims against Johnson, and denies Johnson's Motion for Summary Judgment.

Mouser played a negligible role in the decisions to remove the children and subject them to medical examinations. Only Detective Johnson had the authority to make those decisions, and Mouser acted only at her direction. Because Mouser was not an integral participant in the constitutional violations, the Court finds she is entitled to qualified immunity with respect to all of the Ingrams' claims against her. Accordingly, the Court

grants Mouser's Motion for Summary Judgment, and denies Plaintiffs' Partial Motion for Summary Judgment with respect to Mouser.

Johnson's Motion to Strike is moot. The same arguments they ask the Court to strike were made by the Ingrams elsewhere in the record and at oral argument, and striking the duplicative arguments from one source will have no bearing on the outcome.

Finally, the Ingrams' Motion to Reconsider is procedurally defective. The Court denies this motion.

## VI. ORDER

IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 153) is GRANTED in part and DENIED in part, as outlined above.

2. Defendant Johnson's Motion for Summary Judgment (Dkt. 128) is DENIED.

3. Defendant Mouser's Motion for Summary Judgment (Dkt. 101) is GRANTED. A separate judgment will be entered reflecting this order.

4. Defendant Johnson's Motion to Strike (Dkt. 173) is dismissed as MOOT.

5. Plaintiffs' Motion to Reconsider is DENIED (Dkt. 153).

DATED: January 23, 2024

David C. Nye
Chief U.S. District Court Judge